UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Case No. 0:25-cv-02824-KMM-LIB

United States of America ex rel. Troy
K. Scheffler,

      *Plaintiffs,*

v.

Golden Shovel Agency, LLC,

      *Defendant.*

**SECOND AMENDED COMPLAINT**

Plaintiff-Relator, by and through his undersigned counsel, states and alleges as follows:

## I. Nature of Case

1. This is a false claims act claim. The Qui Tam Plaintiff and Relator, Troy K. Scheffler ("Relator"), alleges that the Defendant fraudulently obtained CARES Act disaster relief by means of fraudulent certifications of eligibility. As set forth in more detail below, Defendant did falsely assert contractors as qualifying employees to fraudulently obtain Paycheck Protection Program relief along with falsely stating rent and utility amounts for reimbursement.

## II. Parties

2. Defendant Golden Shovel Agency, LLC ("Golden Shovel"), whose owner and manager is Minnesota State Representative Ron Kresha, is a Minnesota business entity

1

which primarily conducts business within the State of Minnesota. Defendant's registered office is located at 43 E Broadway, Little Falls, MN 56345.

3. Relator is an adult male domiciled at 26359 Shandy Trl, Merrifield, MN 56465.

### III. Compliance with Requirements of Suit

4. This Second Amended Complaint is filed pursuant to the Court's Order dated June 15, 2026 (Dkt. 27), which granted Plaintiff leave to amend. The initial complaint was filed under seal on July 10, 2025, and unsealed on or about October 3, 2025. Plaintiff retained counsel and filed an Amended Complaint on October 21, 2025. This Second Amended Complaint incorporates additional factual allegations regarding Relator's independent investigation, original source status, and pre-filing disclosure to the Government.

5. The United States was notified of this action and declined to intervene. The Government has not moved to dismiss this action.

### IV. Jurisdiction and Venue

6. This Court has jurisdiction pursuant to 31 U.S.C. Section 3732(a) which provides that this type of action may be brought in any district where any Defendant resides or transacts business. In this case, the Defendant maintains business activity in Minnesota and is duly authorized to transact business in Minnesota as his business is registered in Minnesota by the hand of the Minnesota Secretary of State.

### V. Background

7. Throughout most of 2020 and continuing into 2021, the United States was faced with a large-scale outbreak of the virus commonly known as "Coronavirus" and "Covid-19" (the "Coronavirus Epidemic").

8. All of the above has resulted in major economic disruption and as a result, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act, commonly known as the "CARES Act."

9. The CARES Act contains a provision which permitted qualifying businesses which were affected by the foregoing disruption to obtain forgivable disaster loans.

10. The CARES Act was subsequently amended to provide for a second round of disaster funding. Significantly, an applicant is ineligible for such funding if its business operations were not significantly affected by the outbreak. In Defendant's instance, they were not, as it does its primary business remotely via phone and internet.

11. Defendant also did not qualify for CARES Act relief as it did not have full time or any W-2 employees as fraudulently represented.

12. Defendant also did not qualify as it did not have the claimed rent and utility expenses as fraudulently represented.

13. That on or about 04/28/2020, Defendant, through Ron Kresha, did apply for a PPP loan and was approved for said loan in the amount of $154,600 which included Payroll of $123,200, Rent of $16,400, and Utilities of $15,000.

14. The same application claimed that Defendant reported 17 employees.

15. That on 04/28/2020, Defendant did not have any qualifying employees nor did it have rent or utilities which existed to claim.

16. That Defendant did fraudulently claim said amounts to unlawfully benefit from the United States and its taxpayers.

17. That the loan was serviced through Pine Country Bank, located in Little Falls, Minnesota.

18. That said loan gained by fraud was forgiven by the United States of America in the final amount of $155,948.

19. That on 11/24/2020 — approximately seven months after Defendant obtained the first PPP loan and approximately four months before Defendant applied for the second — Ron Kresha was deposed in an unrelated lawsuit. (Minn. Dist. Ct. 27-CV-20-2623.)

20. During said deposition, Kresha swore under oath to the following answers upon questioning:

Q. "And how many employees currently at the company [Golden Shovel]?"

A. "I have no employees."

Q. "Do you have any independent contractors working for the company?"

A. "I do have independent contractors working for the company."

Q. "How many?"

A. "Approximately 15."

Q. "So what kind of rent has your company [Golden Shovel] been paying you to rent the building over these years?"

4

A. "It has been anywhere from zero to $500 a year. It's been in-kind contributions, they keep up the utilities, the utilities are about $50 a month."

Q. "We've looked at a few documents here today talking about Ms. Whelan as, you know, the director of strategic marketing or the vice president of marketing or the marketing director or titles like that. Do you remember those titles being thrown around?"

A. "I do."

Q. "Is there a particular document that would tell me that there's any particular salary or benefits associated with those titles?"

A. "Not that I can recall. When you're a start-up and you're just getting out there, you try to attribute titles so that you have some recognition with the clients and — it's a way for a start-up to start to bring credibility before they get their brand awareness. So a lot of times we could create titles and so forth on the fly that would lend credence to how we were going to have conversations with other people."

Q. "So giving a title to an independent contractor wouldn't make them an employee of your company, in your view, would it?"

A. "No. In fact, we do that now, all of our – all the people with us are independent contractors and they have a title that fits their role, so that people understand they're communicating within the confines of our company."

Q. "And even though they're not employees of the company."

A. "That's correct."

Q. "Giving an independent contractor an email address does not convert them to an employee in your view, does it?"

5

A. "No, we give emails out to all of our independent contractors because it's just — it makes communication easier."

Q. "Same reason you give them titles, too, right?"

A. "Some we give titles. We also give them business cards."

21. That in this sworn deposition, Kresha admits material facts supportive of this instant action: (1) He has no actual employees of Golden Shovel; (2) All people that work for Golden Shovel are contracted; (3) That a regular business practice of Defendant was to fraudulently represent contractors as actual employees by giving them fake titles to defraud other businesses to gain contracts that Golden Shovel otherwise would not have gained.

22. That on 03/12/2021 — approximately four months after Kresha swore under oath that Golden Shovel had no employees — Defendant, by Ron Kresha, did apply and was approved for a second PPP loan in the amount of $164,700 which included Payroll of $164,697, an undetermined expense of $2, and Utilities of $1.

23. The same application claimed that Defendant reported 20 employees — three more than were claimed on the first application.

24. The timing of these events is significant. Kresha testified under oath on November 24, 2020, that Golden Shovel had "no employees." Four months later, on March 12, 2021, he certified to the federal government that Golden Shovel had 20 employees. This is direct evidence of scienter: Kresha knew at the time of the second application that he had no employees, because he had just said so under oath.

25. That on 03/12/2021, Defendant did not have any qualifying employees nor did it have rent or utilities which existed to claim.

26. That Defendant did fraudulently claim said amounts to unlawfully benefit from the United States and its taxpayers.

27. That the loan was serviced through Pine Country Bank, located in Little Falls, Minnesota.

28. That said loan gained by fraud was forgiven by the United States of America in the final amount of $165,944.

29. That with regard to this instant action, under application for said PPP money, Golden Shovel certified under penalty of perjury, "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the applicant."

30. Golden Shovel did not qualify as its operations were not in fact affected as not only did Golden Shovel not have any employees to be affected, but its contractors worked remotely via internet and telephone as Golden Shovel's main business operations provide online digital marketing services.

31. That throughout the pandemic, Golden Shovel's revenues remained steady if not increased.

32. That the PPP loan applications submitted by Golden Shovel and their accompanying instructions clearly state that independent contractors do not qualify for PPP relief as contractors must obviously apply under their own business.

33. That Golden Shovel did knowingly and in the most generous light did recklessly submit false claims of employee costs, utilities and rent to unlawfully gain the

7

trust of the United States Government to believe that Golden Shovel did qualify for PPP loans and forgiveness which only ultimately unlawfully enriched Golden Shovel and Minnesota State Representative Ron Kresha.

34. That Golden Shovel did swear under penalty of perjury to follow "Paycheck Protection Program Rules" which are easily obtainable during the application process via the lender, government websites in the application process, and otherwise explained during the application process.

35. Said instructions clearly state that eligible payroll is for employees, not contractors and that contractors are themselves borrowers.

### VI. Relator's Independent Investigation and Original Source Status

36. In September 2024, Relator was contacted by Mary Whelan, a past business associate of Ron Kresha. Whelan contacted Relator due to Relator's political activism and her involvement in an unrelated campaign practices dispute with Kresha before the Minnesota Office of Administrative Hearings.

37. During July through September 2024, Kresha was the Respondent in multiple Office of Administrative Hearings proceedings stemming from his false claims of endorsements. (See Duggan v. Kresha, OAH No. 65-0320-40209 (Sept. 27, 2024) (finding Kresha made a false claim of CPAC endorsement but dismissing on the knowledge element over a dissent).) Kresha's defense in the OAH proceedings was that he did not understand the difference between a political organization's "rating" and its "endorsement."

8

38. Whelan, who supported Kresha's primary opponent Diane Webb-Skillings, asked Relator for his opinion on whether to appeal the OAH decision. Whelan also asked Relator to review numerous matters involving Kresha, including a deposition transcript from the civil case Whelan v. Ljubisavljevic, et al. (Minn. Dist. Ct. 27-CV-20-2623). Whelan did not contact Relator regarding PPP fraud, and the transcript was provided for purposes entirely unrelated to the PPP program.

39. During his review of the deposition transcript, Relator noticed that Kresha was remarkably flippant about his representations of contractors as employees — going so far as to brag under oath about giving independent contractors fake titles to make them appear to be regular employees in business dealings with clients.

40. Having recently been investigating financial irregularities by other public officials, Relator searched publicly available databases — including the Pandemic Oversight database maintained by the Pandemic Response Accountability Committee — and discovered that Golden Shovel Agency, LLC had applied for and received two PPP loans claiming 17 and 20 employees, respectively.

41. Remembering Kresha's sworn claims to have no W-2 employees and minimal utility expenses, Relator immediately recognized that Kresha appeared to have misrepresented the number of employees on his PPP loan applications. As Relator is familiar with the law and legal process, the first thing that came to mind was a qui tam action under the False Claims Act.

42. Relator independently cross-referenced Kresha's sworn deposition testimony against the PPP loan applications, the Treasury Department guidelines, and the PPP

program rules, which expressly prohibit counting independent contractors as employees for purposes of PPP eligibility. This independent analysis — connecting Kresha's sworn testimony in an unrelated civil proceeding to Golden Shovel's PPP certifications — is the basis of the fraud allegations in this action.

43. The deposition transcript was taken on November 24, 2020 — over four years before Relator analyzed it. During those four-plus years, the transcript was available to Whelan, to the parties in the underlying civil action, and to anyone else with access to it. No one identified the PPP fraud implications of Kresha's testimony. No one cross-referenced his admissions against PPP loan certifications. No one filed a qui tam action. No one reported the suspected fraud to the Government. Relator is the first and only person to have identified this fraud.

44. Upon identifying the apparent fraud, Relator considered that given the time elapsed between the loan applications and his discovery, Kresha may have voluntarily reimbursed the Government, which would moot a qui tam action. Without confirmation that the fraudulently obtained funds had been retained, filing a qui tam action would have been premature. To determine whether the fraud was still actionable, Relator began an orchestrated pressure campaign specifically designed to elicit a confession or admission from Kresha that would reveal whether the fraudulently obtained funds had been retained or repaid.

45. Through coordinated posts with Whelan on social media, the initial pressure campaign was not reaching any point that was effective. Relator then decided to escalate by entering the Republican Party infrastructure itself.

10

46. On January 4, 2025, Relator contacted Jesse Smith of Action 4 Liberty to see if they could bring publicity to the suspected fraud. At that time, Action 4 Liberty was not interested and this effort went nowhere.

47. On or about March 24, 2025, Relator reported the suspected PPP fraud to the Little Falls Police Department. (ICR No. 25001919.) The Police Department investigated and reported the matter by phone to the FBI. On March 26, 2025, Relator submitted a Data Practices Act request to obtain documentation related to his police report.

48. On June 19, 2025, Relator scheduled to speak to the Morrison County Republican BPOU about the evidence of fraud. The presentation was successful and generated substantial concern among BPOU members, who began asking questions and placing pressure on Kresha.

49. On June 25, 2025, word of Relator's BPOU presentation reached Action 4 Liberty, who then contacted Relator and asked for the evidence Relator had given to State Representative Isaac Schultz, a member of the House Fraud Prevention and State Agency Oversight Policy Committee. Relator provided them with relevant proofs, including the deposition transcript excerpts, PPP loan records, and his analysis. Action 4 Liberty published an article that same day based entirely on the information Relator provided. Relator was the source of the information disclosed by Action 4 Liberty — not the reverse.

50. Despite receiving Relator's evidence, Representative Isaac Schultz and the House Fraud Prevention and State Agency Oversight Policy Committee took no action to

investigate the fraud allegations. The committee's inaction persisted even as multiple BPOU chairs and Republican legislators called for a hearing.

51. On July 5, 2025, Kresha responded to the mounting pressure with a public Facebook post that purported to address the fraud allegations. However, rather than addressing the specific evidence regarding his PPP certifications, Kresha discussed unrelated topics such as nursing homes, thereby failing to provide any explanation for the discrepancy between his sworn deposition testimony and his PPP applications. This non-response was itself informative to Relator's investigation: Kresha addressed everything except the substance of the fraud, reinforcing Relator's belief that the fraud had not been remedied.

52. Relator's investigation prompted recognition of the fraud even within Kresha's own political party — demonstrating that the fraud was not previously known to anyone prior to Relator's independent investigation. Senator Nathan Wesenberg published a statement on the official Minnesota Senate Republicans website acknowledging the substance of Relator's allegations, stating that the qui tam case "has merit," and calling on Kresha to resign. Representative Elliot Engen called for the House Fraud Prevention Committee to hold a hearing on the matter. Representative Drew Roach stated publicly that "we must hold our own accountable" and called on Kresha to resign if the allegations were true. Former Representative Jeremy Munson stated that Relator's case was "about rooting out fraud and corruption." These reactions from members of Kresha's own party confirm that the fraud was unknown before Relator exposed it; one does not demand hearings, investigations, and resignations over information that is already public

knowledge. Shortly thereafter, Kresha announced that he would not seek reelection in 2026.

53. On July 7, 2025, upon invitation by Mille Lacs County Republican BPOU Chair Larry Doose, Relator presented the fraud evidence to the Mille Lacs County BPOU. Representative Isaac Schultz, another close associate of Kresha's, attempted damage control by speaking after Relator. It failed; BPOU members demanded that Schultz and the fraud committee take action.

54. On the evening of July 8, 2025, Relator's pressure campaign achieved its intended result. Due to the pressure becoming untenable, Kresha confessed to BPOU Chair Larry Doose that he had misrepresented employees on his PPP loan applications and that the loans had not been repaid but had instead been forgiven. This confession — an admission against interest elicited by Relator's deliberate investigative strategy — confirmed that the fraud was still ripe, that the fraudulently obtained funds had been retained by Defendant, and that filing a qui tam action was warranted.

55. Through his investigation, Relator also discovered that Kresha gave a webinar on how to file PPP applications and the legal requirements and qualifications for the loans. This demonstrates Kresha's actual knowledge of PPP program requirements — including the prohibition on counting independent contractors as employees — and his knowing misrepresentation of Golden Shovel's employee count on the applications.

56. Relator further discovered evidence that Golden Shovel was using out-of-country contractors — foreign workers who would be wholly outside allowable

13

employees under PPP program guidelines — further demonstrating the scope of the fraudulent certifications.

### VII. Pre-Filing Disclosure to the Government

57. On July 9, 2025 — the day after Kresha's confession confirmed that the fraud was still actionable — Relator sent a disclosure package to the United States Attorney's Office for the District of Minnesota via United States Postal Service Certified Mail. The package contained Relator's analysis, the deposition transcript excerpts, PPP loan documentation, and a letter detailing the fraud. USPS tracking (No. 9505516012565190245500) confirms the package was accepted by USPS in Brainerd, Minnesota at 4:41 PM on July 9, 2025, and was delivered to the U.S. Attorney's Office at 300 South 4th Street, Minneapolis, Minnesota 55415, on July 11, 2025 at 9:57 AM.

58. On July 10, 2025, Relator filed the initial Complaint in this action at the United States Courthouse in Duluth, Minnesota.

59. On August 1, 2025, Relator supplemented his disclosure to the Government by email, transmitting copies of the complaint, loan documentation, the Kresha deposition transcript, and correspondence to the U.S. Attorney General and the U.S. Attorney for the District of Minnesota.

60. Relator voluntarily provided the information on which the allegations in this action are based to the Government both before filing (via certified mail on July 9, 2025) and after filing (via email on August 1, 2025), satisfying the requirements of 31 U.S.C. § 3730(e)(4)(B).

### VIII. Original Source Status

61. Relator is an original source of the information underlying this action within the meaning of 31 U.S.C. § 3730(e)(4)(B). Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions.

62. Relator's knowledge is independent because: (a) Relator received the deposition transcript for reasons entirely unrelated to PPP fraud; (b) Relator independently analyzed the transcript and identified the fraud implications that no other person recognized in over four years; (c) Relator independently discovered the PPP loan records through publicly available databases; (d) Relator independently cross-referenced the sworn testimony against the PPP certifications and applicable Treasury guidelines; (e) Relator reported the fraud to the Little Falls Police Department in March 2025, approximately three months before any media publication; (f) Relator provided the information to Action 4 Liberty — not the reverse; and (g) Relator designed and executed the pressure campaign that elicited Kresha's confession.

63. Relator's knowledge materially adds to any public disclosure because: (a) Relator possesses the entire deposition transcript, not merely the two brief excerpts published by Action 4 Liberty; (b) Relator independently obtained Kresha's confession to BPOU Chair Larry Doose that the loans had not been repaid but forgiven; (c) Relator discovered evidence of Kresha's scienter in the form of a PPP webinar demonstrating Kresha's knowledge of program requirements; (d) Relator discovered evidence of out-of-country contractors further demonstrating the scope of fraud; (e) Relator's pre-filing investigative work and pressure campaign generated the information that ultimately became public; and (f) the timing of Kresha's deposition between the two PPP

15

applications constitutes independent evidence of scienter that Relator identified through his own analysis.

64. Through his diligence, perseverance, legal knowledge, and pressure in this matter, this action would not have succeeded to garner the proof and confidence to file a qui tam lawsuit.

### IX. Count 1 — Violation of the False Claims Act (First PPP Loan)

65. Relator restates, realleges, and reincorporates the above stated facts.

66. The False Claims Act imposes liability on a person or entity who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

67. Courts have held that this can include false statements regarding eligibility to participate in a program. See United States ex rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94, 116 (2d Cir. 2010).

68. That on or about 04/28/2020, Defendant, through Ron Kresha, did apply for a PPP loan and was approved for said loan in the amount of $154,600 which included Payroll of $123,200, Rent of $16,400, and Utilities of $15,000.

69. The same application claimed that Defendant reported 17 employees.

70. That on 04/28/2020, Defendant did not have any qualifying employees nor did it have rent or utilities which existed to claim.

71. That Golden Shovel did not generally qualify for the PPP program as its operations were not directly affected by the pandemic shutdowns as it and its contractors operated remotely and continued to do business.

16

72. That Defendant did fraudulently claim said amounts to unlawfully benefit from the United States and its taxpayers.

73. That the United States Government did rely on Defendant's knowing or reckless false statements to forgive the final amount of $155,948, which Defendant was not entitled, at the expense of the United States taxpayers.

74. Thus, Defendant's certifications of eligibility violated the False Claims Act because they were false and required for eligibility for PPP relief.

75. Defendant is liable for the amount of $155,948 for this claim and Relator seeks judgment for treble damages and civil penalties set forth in 31 U.S.C. § 3729 amounting to $467,844.

### X. Count 2 — Violation of the False Claims Act (Second PPP Loan)

76. Relator restates, realleges, and reincorporates the above stated allegations as if fully set forth herein.

77. The False Claims Act imposes liability on a person or entity who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

78. Courts have held that this can include false statements regarding eligibility to participate in a program. See United States ex rel. Kirk v. Schindler Elevator Corp., 601 F.3d 94, 116 (2d Cir. 2010).

79. That on 03/12/2021, Defendant, by Ron Kresha, did apply and was approved for a PPP loan in the amount of $164,700 which included Payroll of $164,697, an undetermined expense of $2, and Utilities of $1.

17

80. The same application claimed that Defendant reported 20 employees.

81. That on 03/12/2021, Defendant did not have any qualifying employees nor did it have rent or utilities which existed to claim.

82. That Golden Shovel did not generally qualify for the PPP program as its operations were not directly affected by the pandemic shutdowns as it and its contractors operated remotely and continued to do business.

83. That Defendant did fraudulently claim said amounts to unlawfully benefit from the United States and its taxpayers.

84. That the United States Government did rely on Defendant's knowing or reckless false statements to forgive the final amount of $165,944, which Defendant was not entitled, at the expense of the United States taxpayers.

85. Thus, Defendant's certifications of eligibility violated the False Claims Act because they were false and required for eligibility for PPP relief.

86. Defendant is liable for the amount of $165,944 for this claim and Relator seeks judgment for treble damages and civil penalties set forth in 31 U.S.C. § 3729 amounting to $497,832.

**WHEREFORE PLAINTIFF/RELATOR PRAYS FOR THE FOLLOWING**

**RELIEF:**

1) On behalf of the Government, Relator is seeking entry of judgment against the Defendant in favor of the United States of America for treble damages and civil penalties set forth in 31 U.S.C. § 3729 in the amount of $965,676;

2) Additional amounts related to processing fees and potential interest in respect to the loan;

3) An award of attorneys' fees and costs;

4) An appropriate qui tam award;

5) All other legal relief appropriate under the circumstances.

Dated: _____, 2026

/s/ H. Alan Kantrud
H. Alan Kantrud
MN Attorney Reg. No. 0281086
P.O. Box 517
Willernie, MN 55090
612-743-4242
hakantrud@protonmail.com
Attorney for Plaintiff/Relator

## VERIFICATION

The undersigned declares under penalty of perjury that the contents of the foregoing Second Amended Complaint are true and correct to the best of his knowledge.

/s/ ***Troy Scheffler***                     06/30/2026
Troy K. Scheffler
26359 Shandy Trl
Merrifield, MN 56465
763-225-7702